Denise De Mory (SBN168076)
Richard Lin (SBN 209233)
Aaron Hand (SBN 245755)
Brenda Entzminger (SBN 226760)
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (415) 426-4744
ddemory@bdiplaw.com
rlin@bdiplaw.com
ahand@bdiplaw.com
bentzminger@bdiplaw.com

Attorneys for Defendant/Counter-Claimant
*Agilent Technologies, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNTHEGO CORPORATION,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>AGILENT TECHNOLOGIES, INC.,<br><br>Defendant/Counter-Claimant. | CASE NO. 5:21-cv-07801-EJD<br><br>**DEFENDANT/ COUNTER-CLAIMANT AGILENT TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AGAINST PLAINTIFF/COUNTER-DEFENDANT SYNTHEGO CORPORATION**<br><br>Date: July 7, 2022<br>Time: 9:00 a.m.<br>Courtroom: 4<br>Judge: Hon. Edward J. Davila |

# REDACTED

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT ................................................................................................................... 3

    A. Agilent is likely to succeed on the merits. ........................................................... 3

        1. Likelihood of success as to infringement weighs heavily in favor of maintaining the status quo. ........................................................................ 3

        2. This case should maintain the status quo while deciding validity and all other issues on the schedule it has already set. ...................................... 4

        3. Synthego's inequitable conduct defense should be dismissed. .................... 8

    B. Agilent has demonstrated a high likelihood of irreparable harm for which there is no adequate remedy at law. ..................................................................... 9

    C. The balance of hardships favors injunctive relief. .............................................. 13

    D. The public interest favors the requested injunctive relief. .................................. 14

III. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Lab'ys v. Sandoz, Inc.*,
 544 F.3d 1341 (Fed. Cir. 2008) ................................................................................... 13, 15

*Aevoe Corp. v. AE Tech Co., Ltd.*,
 No. 2:12-cv-00053-GMN-NJK, 2014 WL 1089676 (D. Nev. Mar. 18, 2014) ............................. 4

*Boyce's Ex'rs v. Grundy*,
 28 U.S. (3 Pet.) 210 (1830) ................................................................................................. 13

*Broadcom Corp. v. Qualcomm, Inc.*,
 533 F.3d 683 (Fed. Cir. 2008) ............................................................................................. 12

*Cummins-Allison Corp. v. SBM Co., Ltd.*,
 669 F. Supp.2d 774 (E.D. Tex. 2009) ................................................................................ 12

*Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*,
 153 F. Supp. 2d 1253 (D. Kan. 2001) ................................................................................ 13

*Forest Labs., Inc. v. Ivax Pharmaceuticals, Inc.*,
 438 F. Supp. 2d. 479 ............................................................................................................ 7

*Frazier v. Roessel Cine Photo Tech, Inc.*,
 417 F.3d 1230 (Fed. Cir. 2005) ............................................................................................ 9

*Fresenius USA, Inc. v. Baxter Int'l, Inc. (Fresenius II)*,
 721 F.3d 1330 Fed. Cir. 2013) ............................................................................................ 4

*Hybritech Inc v. Abbott Lab'ys*,
 No. CV-86-7461-AK(PX), 1987 WL 123997 (C.D. Cal. July 14, 1987) .................................. 13

*i4i Ltd. Partnership v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) ............................................................................................. 11

*Impax Labs., Inc. v. Aventis Pharms. Inc.*,
 545 F.3d 1312 (Fed.Cir.2008) .............................................................................................. 7

*In re Donohue*,
 766 F.2d 531 (Fed. Cir. 1985) .............................................................................................. 7

*In re Morsa*,
 803 F.3d 1374 (Fed. Cir. 2015) ............................................................................................ 7

*In re Wands*,
 858 F.2d 731 (Fed. Cir. 1988) .............................................................................................. 7

*Kewanee Oil Co. v. Bicron Corp.*,
 416 U.S. 470 (1974) ............................................................................................................ 15

*Live Nation Merch., Inc. v. Miller*,
  No. 13-CV-03936 CW (NC), 2014 WL 1877912 (N.D. Cal. May 9, 2014) .............................. 6

*Open Text SA v. Box, Inc.*,
  36 F. Supp. 3d 885 (N.D. Cal. 2014) ................................................................................... 11

*Polymer Techs., Inc. v. Bridwell*,
  103 F.3d 970 (Fed. Cir. 1996) ............................................................................................. 13

*Sanofi-Synthelabo v. Apotex, Inc.*,
  550 F.3d 1075 (Fed. Cir. 2008) ...................................................................................... 7, 15

*Therasense, Inc. v. Becton, Dickinson and Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ......................................................................................... 8, 9

*Tinnus Enter., LLC v. Telebrands Corp.*,
  846 F.3d 1190 (Fed. Cir. 2017) ............................................................................................. 5

*Titan Tire Corp. v. The Goodyear Tire & Rubber Co.*,
  566 F.3d 1372 (Fed. Cir. 2009) ............................................................................................. 4

*Trivascular, Inc. v. Samuels*,
  812 F.3d 1056 (Fed. Cir. 2016) ............................................................................................. 5

*Waters Corp. v. Agilent Technologies Inc.*,
  410 F. Supp. 3d 702 (D. Del. 2019) .................................................................................... 14

**Statutes**

35 U.S.C. § 316(a)(5)(A) ............................................................................................................. 8

**Regulations**

37 C.F.R. § 42.51 ........................................................................................................................ 8

## I.     INTRODUCTION

Agilent is entitled to a preliminary injunction at least as to Synthego's offers for sale and sale of products for diagnostic, therapeutic, and other commercial applications; and use at or by Synthego, as set forth in Exhibit A hereto.[1]  An injunction of this scope, which carves out safe harbor exempt sales and sales restricted to Research Use Only, will maintain the status quo while having no impact on Synthego or the public interest, and is amply justified in the record.

All of Synthego's modified guide RNA products infringe the asserted patents.  Synthego has long known that the success of its guide RNA products is due to its use of what it proclaimed—until this case—to be Agilent's "landmark" innovations, which it admits it copied from the Hendel paper.  It has now admitted that its Chief Scientist ██████████ ██████████████████████████████████████████████████████████  Tellingly, even when confronted with an expert declaration establishing its infringement and the possibility of being enjoined, Synthego does not contest infringement even though Synthego invoked the jurisdiction of this Court solely under the pretense that it did not infringe.  Dkt. 1.

Synthego's declaratory judgment complaint also alleges that all its infringing activities fall under the safe harbor exemption because they are being used for FDA approval.  *Id*. ¶¶ 21, 25.  But Synthego now argues against its own complaint; it contends that most of its sales—its Research Use Only ("RUO") products—can only be used for research and cannot be used for pre-clinical or clinical trials.  Dkt. 76-1 ¶¶ 5-7, 17-18.  Synthego also concedes that GMP products that will be used in pharmaceutical and therapeutic products are not subject the safe harbor either.  And even as to the subset of products that could conceivably be being used for FDA approval, Synthego failed to come forward with any evidence that a single product is.

Agilent and Synthego are head-to-head competitors in the GMP market.  *E.g.*, Ex. 54 at 592 (Agilent is a ██████████████████████████  Ex. 55 at 2.  Synthego's opposition also

---

[1] Synthego contends that commercial use of its products for therapeutics is, at best, several years away, and in any event, that its potential customers in this space all have second sources.  Dkt. 76-28 ¶ 15.  Thus, as long as the injunction entered here carves out any uses that Synthego can actually establish to be related to FDA-approval as well as sales restricted to Research Use Only, which were the only sales Agilent offered to license, Synthego will not be harmed, nor will the public interest be impacted if the status quo is maintained.

establishes that Synthego and Agilent are the only two companies that compete in all three identified market segments. Critically, while Synthego notes that others sell guides for roughly the same price as Synthego now, Synthego does not dispute that it drove the down the market, nor can it. Documents it produced evidence its aggressive pricing strategy untethered to its actual costs. In fact, as of February, Synthego had already spent its first $300M in funding but had only realized ▓▓▓ in annual sales. Synthego was able to focus on manufacturing because, by its own admission it did not "innovate on the chemistry." Instead, it admits its products incorporate the innovations of others. Synthego attempts to excuse its willful infringement by claiming that it should not have to pay Agilent because others pioneered these inventions before Agilent, ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Synthego set out to capture (and forever change) the market at all costs without regard to the intellectual property of others; the ongoing impact of its actions are difficult to quantify, and weigh heavily in favor of maintaining the status quo.

       Admittedly, two questions remain: inequitable conduct and validity. As to inequitable conduct, Synthego's claims should be dismissed with prejudice. Synthego has now deposed the first-named inventor of the patents-in-suit, but cannot, as a matter of undisputed fact and law, muster a scintilla of evidence that anyone at Agilent had any intent to deceive the Patent Office, which is necessary to maintain the claim under *Therasense*.

       As to invalidity, the law is clear: an institution decision does not by itself raise a substantial new question of patentability for purposes preliminary injunction proceedings. But in any event, Synthego invoked this Court's jurisdiction and invalidity can and should be decided in this Court on the expedited schedule already set by this Court, which is set to resolve the entire case before either Final Written Decision even issues. Dkt. 51. The PTAB institution decisions themselves establish that this case presents complicated and novel issues that are much more appropriately addressed in this Court where a more fulsome record can be developed, which even the PTAB conceded is needed. Dkt. 77-1 at 29, 31. Synthego itself argues that discovery in this case (and beyond what is permitted in the PTAB) is critical to a determination of the validity issues. Rather than request additional discovery in the PTAB where it knows that any discovery beyond the deposition of a competing expert will be denied, Synthego is using the proceeding in

this Court to obtain that evidence, and has filed a separate motion to attempt to secure its ability to do so.  Dkt. 83 at 1, 4-5; Opp. at 5-6.  As a matter of fundamental fairness, Agilent should have the same opportunity to obtain discovery beyond what the PTAB allows.  Separately, the institution decision expresses great skepticism about several dependent claims that are implicated in this case, and thus, the PTAB proceedings are unlikely to fully resolve this matter anyhow.

Thus, the Court should enter the requested preliminary injunction and maintain the status quo while it resolves this case on the schedule it has already set, which provides that all fact and expert discovery will be complete and dispositive motions will be briefed by January 6, 2023.  In contrast, Final Written Decisions are not due until late May 2023, and are unlikely to resolve all issues in this case.

## II.  ARGUMENT

### A.  Agilent is likely to succeed on the merits.

#### 1.  Likelihood of success as to infringement weighs heavily in favor of maintaining the status quo.

Agilent established that Synthego infringes claims 1-5, 8, and 16 of the '034 Patent and claims 1-3, 6, 9, 21-22, 25, and 27-30 of the '001 Patent.  Dkt. 40 at 14-16.  Beyond documenting infringement relating to Synthego's CRISPRevolution products (Dkt. 42 ¶¶ 72-148), which include modified guide RNA, Agilent's infringement proof included evidence that all of Synthego's Eclipse-Platform products, including Synthego's engineered cells, use the patented inventions (e.g., Dkt. 42 ¶¶ 2, 72(k), 72(l), 72(n), 72(o), 72(p), 72(q), 72(r), 73).  Synthego does not dispute that any of these Accused Products practice each and every element of the asserted patent claims.

Synthego likewise does not dispute that many of the Accused Products fall entirely outside of the safe harbor protections.  The safe harbor exemption applies in the context of FDA approval.  But Synthego agrees that once FDA approval is obtained, the safe harbor no longer applies.  Thus, commercial sales of approved therapeutics and diagnostics fall outside the scope of the safe harbor.  As to RUO, notwithstanding its allegation in its declaratory judgment complaint, Synthego now makes no argument that these uses fall in the safe harbor exemption.  Opp. at 10-

11. And as to Synthego's own use and Eclipse platform, Synthego likewise makes no argument. As to its so-called GMP-like and GMP products, Synthego points to alleged "terms of sale" which mirror some of the language of Section 271(e)(1), but has offered no evidence that any customer has actually accepted those terms and conditions. In fact, the only signed orders and agreements that Synthego provided do not contain those terms that Synthego argues give rise to safe harbor protection. Opp. at 11-12 (citing Nowatzke Decl. ¶¶ 13, 23, 26, 33, 34); *but see* Ex. J ¶ 23, Exs. P "terms" omitted), K (omitted), L (omitted), M (omitted), N (omitted), O (omitted), R (omitted), U (omitted), X (omitted), Y (omitted), Z (omitted). In any event, a signed agreement with the term Synthego cites would merely mean that the customer could potentially use the product for a regulatory approval purpose; it would not be proof that they do.[2] *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1338-39 (Fed. Cir. 2019) (accused infringer bears the burden of proving each activity falls within the safe harbor exemption).

Synthego failed to demonstrate the "substantial merit" required to rebut Agilent's showing of likelihood of success on the merits. *Titan Tire Corp. v. The Goodyear Tire & Rubber Co.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (internal citation omitted).

> **2.  This case should maintain the status quo while deciding validity and all other issues on the schedule it has already set.**

Institution of IPR proceedings does not establish that substantial questions exist as to the Asserted Patents' validity, "[u]nless and until a patent claim is canceled by a final decision, it is valid and enforceable during the pendency of a [reexamination] proceeding." *Aevoe Corp. v. AE Tech Co., Ltd.*, No. 2:12-cv-00053-GMN-NJK, 2014 WL 1089676, at *3 (D. Nev. Mar. 18, 2014) (denying motion to dissolve a PI despite final rejection of the claims in reexamination) (*citing Fresenius USA, Inc. v. Baxter Int'l, Inc. (Fresenius II)*, 721 F.3d 1330, 1344-46 (Fed. Cir. 2013) (reexamination decisions are not 'final' until the patent owner has exhausted all avenues on appeal)). In fact, the PTAB's institution decisions do not by themselves raise a substantial new question of validity for preliminary injunction purposes. *See, e.g., Tinnus Enter., LLC v.*

---

[2] Ms. Nowatzke declares that Synthego has this evidence (Dkt. 76-1, Nowatzke Decl. ¶ 13, 26. Thus, Synthego could have produced this evidence if it was in fact helpful to its cause.

*Telebrands Corp.*, 846 F.3d 1190, 1202 n.7 (Fed. Cir. 2017) (affirming PI and ruling that accused infringer had not raised a substantial question as to invalidity based on institution decision even where FWD rejecting claims issued during pendency of the appeal).  This makes sense, because, as Federal Circuit explained, "the Board is not bound by any findings made in its Institution Decision" because "[a]t that point, the Board is considering the matter preliminarily without the benefit of the full record." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016). The USPTO's own statistics help explain why this is the law.  As of May 2022, eighty-two (82) percent of all IPR petitions in the bio/pharma field are instituted.  *See* PTAB Trial Statistics, May 2022 IPR and PGR, at 9.[3]  Whereas only seventeen (17) percent of all challenged patents result in a final written decision of unpatentability as to all claims.  *See* PTAB Statistics, FY21 End of Year Outcome Roundup IPR, PGR, CBM at 12.[4]

Here, in light of "the unpredictability of the effects of RNA modifications on various RNA or oligonucleotide types," the PTAB "expressed skepticism" regarding Synthego's showing of obviousness for various dependent claims of the '034 Patent, "e.g., claims 5-13 and 20-28," and claims 14 and 29 ("ground six") (Dkt. 77-1 at 31), as well as "claims 8, 9, 11, 16, 18, 19, 25, and 26" of the '001 Patent.  (Dkt. 77-2 at 30-31).  While it is true that not all of these claims are at issue in this preliminary injunction proceeding, there is compelling evidence that this is only because Agilent's proof of infringement as of the time it filed its injunction motion was based solely on publicly available information.  Since that time, Agilent has, for example, learned that claim 14 of the '034 Patent, is in fact practiced by Synthego. De Mory Decl., Ex. 56 at 1774 (showing ███████████████████████████████████████████████████████ ███████████████████████).

And it is likely that more claims would have been added already but for Synthego's ongoing improper discovery tactics.  The various dependent claims at issue in this case cover different modifications.  Yet, Synthego has systematically obstructed inquiry into both the nature

---

[3] *At* https://www.uspto.gov/sites/default/files/documents/ptab_aia_20220531_.pdf.

[4] *At* https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021__roundup.pdf

1  and locations of modifications associated with its actual sales,[5] by redacting that information from
2  all its production documents. Ex. 74 (SYNTHEGO-AGI00004065-4079) is instructive:

[redacted]

11  To be clear, Synthego applied them to each and every document *as produced in discovery*. While
12  Synthego finally unredacted certain information from exhibits to the Nowatzke Declaration earlier
13  today,[6] Agilent has been asking for fulsome information about modifications and unredaction
14  since May 4. De Mory Decl., Exs. 66-69. This obfuscation is not permitted under the Federal
15  Rules of Civil Procedure. *Live Nation Merch., Inc. v. Miller*, No. 13-CV-03936 CW (NC), 2014
16  WL 1877912, at *3 (N.D. Cal. May 9, 2014) (ordering reproduction of unredacted version of
17  documents). If the information that Synthego redacted (or otherwise failed to produce) implicate
18  claims that the PTAB has already found are not likely to be found invalid, this provides a further
19  compelling reason that Court should maintain the status quo while it resolves this case on the
20  schedule it has already set.
21        Separately, the PTAB's institution decisions provide strong support for proceeding in this
22  forum while maintaining the status quo even as to the claims which the PTAB indicated that "at
23  least facially" a prior art reference like Pioneer Hi-Bred (without any demonstration of operability)
24  "need not disclose test data to support its teaching that the modified crRNAs in Table 8 have the

---

[5] Synthego has repeatedly pointed Agilent to a single document describing Synthego's [redacted], which is also the only document it cited in its P.L.R. 3-4(a) disclosures. Ex. 70 at 35 & Ex. 56. [redacted].

[6] *See also* Nowatzke Decl., Exs. H, K-O, U, X.

recited guide RNA functionality." Dkt. 77-1 at 29; Dkt. 77-2 at 29.  The PTAB indicated that a more fulsome record will be required for consideration of the petitions.  Dkt. 77-1 at 29 (noting that "this case is still at a preliminary stage and the record is not fully developed"), 31 (discussing need for further factual development on unpredictability); Dkt. 77-2 at 29, 31 (same).

Even as to the PTAB's *Fintiv*-based conclusion that "the merits of Petitioner's anticipation ground appear to be particularly strong" for some claims, there are critical questions of law and fact that Agilent raised but the PTAB failed to address:  the level of unpredictability in this area of the art and how such unpredictability impacts the determination of whether a prior art reference is enabling for purposes of anticipation. Ex. 57 ('034 POPR) at 38-47; Ex. 58 ('001 POPR) at 39-47; *see also In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) (setting forth factual considerations, including unpredictability of the art, to determine whether a person of ordinary skill in the art would be able to practice the claimed invention without undue experimentation).

Synthego pointed to four proposed modification designs in its Petition from Table 8.  The PTAB acknowledges that Agilent demonstrated that these included non-functional designs.  This should have been enough.  *See, e.g.*, *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 438 F. Supp. 2d. 479, 486-87 ("[F]ailures by those skilled in the art (having possession of the information disclosed by the publication) are strong evidence that the disclosure of the publication was nonenabling.") (quoting *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985)).  But importantly, Table 8 includes 26 additional proposed modification designs.  Agilent should have a full and fair opportunity to explore, through third-party discovery or otherwise, whether any others remained functional.

To be enabling, a reference must "enable one of ordinary skill in the art to make the invention without undue experimentation." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed.Cir.2008).  Determining enablement is a question of law based on underlying factual determinations. *In re Morsa*, 803 F.3d 1374 (Fed. Cir. 2015).  Here, these factual questions warrant the complete and fulsome development of a factual record regarding unpredictability in the art, and whether the alleged invention of Pioneer Hi-Bred does, as Agilent contends, require undue experimentation. *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1085 (Fed. Cir. 2008) (holding that the district court correctly concluded prior art lacked enablement

where discovery of the method and combination of variables required was sufficiently uncertain and arduous as to require undue experimentation).

Even Synthego contends that a more fulsome record than will be available in the PTAB is needed. As Synthego knows, any discovery beyond deposing the opposing expert is disfavored in the PTAB. *See, e.g.*, 35 U.S.C. § 316(a)(5)(A) ("discovery shall be limited to [] the deposition of witnesses submitting affidavits or declarations and [] what is otherwise necessary in the interest of justice"); 37 C.F.R. § 42.51(b)(1)-(2). Thus, rather than ask the PTAB for additional discovery, which likely would be denied, Synthego is using this forum as an end-run around those rules. Synthego filed a separate motion in this Court for the sole purpose of being able to use the discovery it obtained in this case in the IPR proceedings even though the PTAB would never have allowed it to obtain this discovery. Dkt. 83 at 1, 4-5; Dkt. 74-3 at 5-6. Synthego's insistence that *this Court's* procedures are essential to determining these complicated issues underscores that *this Court* should decide them, and should do so on the expedited schedule that it already set.

### 3. Synthego's inequitable conduct defense should be dismissed.

Agilent's motion to dismiss details Synthego's inability to sustain this defense. *See, e.g.*, Dkt. 27; Dkt. 62. Neither in its Opposition to that motion, nor in its Opposition to the instant motion, has Synthego offered any evidence that cures those fatal flaws. Indeed, Synthego's IPRs and the Board decisions thereon further establish that Synthego cannot meet its legal burden to demonstrate "but-for materiality." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011). Neither Deleavey nor Eckstein could be "but-for material" such that the PTO would not have allowed a claim had it been aware of the undisclosed prior art. In fact, Eckstein is so immaterial that Synthego omitted this reference from any ground in its IPRs. And as shown above, the Board expressed "skepticism" for Synthego's obviousness challenges which relied on Deleavey. Dkt. 77-1 at 31; Dkt. 77-2 at 30-31.

But even more critical, and fatal to Synthego's position (that the alleged failure to disclose the cumulative Deleavey and Eckstein references notwithstanding the disclosure of some 240 other ones, along with a manuscript in which those references were cited), the record establishes that Synthego cannot show "specific intent to deceive the PTO," which is a prerequisite to

maintaining its claim. *Therasense*, 649 F.3d at 1290. Because such evidence "must be sufficient to *require* a finding of deceitful intent in the light of all of the circumstances," Synthego's citations to Dr. Ryan's "I don't know" responses cannot meet that burden as a matter of law. *Id.* And Synthego's recitation of select "facts" is disingenuous, bordering on misrepresentation. Dr. Ryan testified that work leading to the Asserted Patents began in 2013, and that neither he nor his co-inventors became aware of the Deleavey or Eckstein references during their research. Ex. 59, Ryan Dep. Tr. at 28:24-29:3, 33:2-21 (consideration of prior art did not include Deleavey or Eckstein). In fact, Dr. Ryan never conducted a comprehensive literature search (31:12-16), nor was he required to do so. *E.g.*, *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005). None of the inventors considered or used the Deleavey or Eckstein references in the inventive process. Ex. 59 at 80:7-16. And there was never any consideration (much less any decision) not to submit them during prosecution. *Id.* at 77:12-78:18, 80:18-21. Although those review articles were identified while preparing a joint manuscript with researchers at Stanford University (which was, itself, presented to the Patent Office), there is no basis to conclude (or even suggest) any intent to withhold information or otherwise deceive the Patent Office. *See id.* at 73:18-75:9 (focused on submitting primary references to USPTO).

  **B. Agilent has demonstrated a high likelihood of irreparable harm for which there is no adequate remedy at law.**

Agilent has been irreparably harmed by Synthego's sales and promotion of infringing products and will continue to be harmed absent a preliminary injunction. Dkt. 40 at 21-24. Indeed, Agilent is not only being forced to compete against Synthego's products that incorporate and infringe Agilent's own patented technology, worse still, Synthego—Agilent's only U.S. competitor in the full-service gRNA market—promotes its successful poaching of Agilent's customers and key opinion leaders by undercutting Agilent's prices and giving away infringing products for free. Dkt. 40 at 21-22; Carter Decl. ¶¶ 11-13, 15; Dkt. 41-8 at 2-3. Synthego's conduct is especially egregious in a market with an explosive growth stage, and one in which customers remain with the same supplier from their research needs through GMP-required stages. Dkt. 40 at 22; Carter Decl. ¶¶ 10, 14; Ex. 64 at 68.

Synthego's opposition only confirms that Agilent will suffer irreparable harm absent an injunction. First, although Synthego tries to downplay Agilent's role as a competitor in the RUO modified gRNA market (Opp. at 18-19), that is not what it says on its website. In a 2019 interview, Synthego boasts about diverting Agilent RUO customers to Synthego with lower prices:

> DD: … I heard about Synthego about a year and a half ago. Kevin Holden got in touch with Ayal Hendel, who was the first author in the Nature Biotech paper, about being a supplier of these modified guides. **At that point, the only people we knew who made them were Agilent, who we had the collaboration with**. Kevin claimed **that Synthego could make synthetic modified sgRNAs at a smaller scale and cheaper cost**. . .
>
> JR: **So, prior to Synthego, you were using Agilent?**
>
> DD: **Yes…**

Dkt. 41-8 at 3 (emphases added). In this interview with Dr. Daniel Dever, of Matthew Porteus' laboratory at Stanford University, Synthego flouted not only that it had successfully lured away the very type of research customer whose exploratory work in sickle cell disease may evolve to GMP supply needs, but also targeted a laboratory of scientists known throughout the world for cutting-edge CRISPR research—that is, key opinion leaders ("KOLs") whose publications and supply choices carry enormous influence in the market. *Id*. at 2-3; *see also* Carter Decl. ¶¶ 11-14.

Attracting and retaining these research customers is critical to retaining share in the GMP market, which Synthego does not dispute. Carter Decl. ¶¶ 13-14. Synthego does not dispute that "a customer who initially purchases its gRNAs from a supplier in one market (i.e., RUO, mid-scale, or GMP) is highly likely to stay with that same supplier for all purchases of gRNAs in all three markets." *Id.* As the only "full-service" providers of gRNA – from research to GMP—Agilent and Synthego are sole competitors in the domestic market.[7] Carter Decl., ¶¶ 17, 105. Notably, Steiner offers no evidence to contradict that only Agilent and Synthego are in each

---

[7] Synthego does not dispute that Agilent and Synthego are the sole suppliers of modified gRNA in every U.S. market segment – RUO, mid-scale (or GMP-like) and GMP—and thus are the only U.S. competitors for "full-service" modified guide RNA across all stages of research to clinical applications. Whereas Steiner offers opinions about "competitors" in the RUO and mid-scale segments—combining both GMP-like and GMP as one category of competitors—Steiner fails to distinguish between U.S. companies and those who operate outside the U.S. *See* Steiner Decl. ¶ 10; *but see* Ex. 60 (Carter Dep. Tr.) at 17 (identifying Synthego and BioSpring as Agilent's sole GMP competitors), 105:12 (BioSpring's GMP facilities are solely outside the U.S.).

segment in the United States. *Cf.* Steiner Decl. ¶ 10.

Synthego's only evidence about the purported lack of competition is that ████████ ████████████████████████████████████████████████████████████████ Opp. at 19. But this makes sense from a practical perspective: researchers use a drop-down menu on Synthego's website to order their guide RNAs from Synthego at a price point of approximately $100. It is not surprising that Mr. Steiner has not heard from these researchers about Agilent—or at all! But in any event ████████████████████████ does not refute or undermine Agilent's evidence that Synthego has actively poached Agilent's research customers and KOLs by offering Agilent's patented technology at lower prices, as it proudly boasts on its website. *See, e.g.*, Dkt. 41-8 at 2-3.

"In a market where only two parties are directly competing, the potential harm in allowing the defendant to continue its infringing conduct is probably at its greatest." *Open Text SA v. Box, Inc.*, 36 F. Supp. 3d 885, 906 (N.D. Cal. 2014) (*citing i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010)). This is particularly compelling where, as here, that competitor's business strategy is to destroy the established pricing expectations—the very expectations on which Agilent's substantial investment was based. Synthego does not dispute that it drove down the market price for guide RNAs. Indeed, Synthego's Q2 2020 product roadmap brags that it ████████████████████████. Ex. 61 at -487 (████████████████████████████ ████████████████████████████████████████████████████████████████); *id.* at -484 ████████████████████ Ex. 62 at 21 (sales training emphasizing ████████████████ It did and does so to drastically disrupt a market created by others' innovations; Synthego provided no response to an interrogatory seeking *Synthego's* research and development efforts to identify functional or effective gRNA modifications. Ex. 62 at 9-10 (Resp. to Interrog. 6). Synthego has burned through cash; over $500M in funding, reaching a sales level of only around ████. Steiner Decl. ¶ 19. Synthego's low pricing strategy was not the product of efficient manufacturing, but a strategy to disrupt the market through falsely low prices. On top of this, Synthego refuses to pay the people who developed the underlying technology; apart from refusing to meaningfully negotiate with Agilent, Synthego is not licensed by ████████████,

and provided no evidence that it paid any royalties to ▓▓▓▓▓▓ (or others).[8] Synthego's business model is critically damaging to the market and to established innovators like Agilent, which weighs heavily in favor of maintaining the status quo.

Agilent's prior efforts to license do not mitigate Agilent's irreparable harm. Agilent has never offered anything other than an RUO license to a company, like Synthego, whose business is selling guide RNAs. Doing so has no impact on Agilent's ability to license pharmaceutical companies once the therapeutics and diagnostics are approved. But if Synthego can continue to drive down prices by refusing to license the intellectual property of companies like Agilent and ▓▓▓▓▓▓, who developed technology at issue, ▓▓▓▓▓▓, who Synthego claims developed some of the technology Agilent claims, the impacts will be irreparable.

An infringer like Synthego cannot build its business on the foundation of infringement, and later be heard to rely on the success of that infringement to avoid an ▓▓▓▓▓▓

▓▓▓▓▓▓

▓▓▓▓▓▓ Ex. 65 (6/8/2022 Resp. Rog. 3); *see, e.g., Broadcom Corp. v. Qualcomm, Inc.*, 533 F.3d 683, 704 (Fed. Cir. 2008) (an infringer "should not be permitted to prevail on a theory that successful exploitation of infringing technology shields a party from injunctive relief."). Likewise, the potential for a compulsory license does not mitigate that harm. *Cummins-Allison Corp. v. SBM Co., Ltd.*, 669 F. Supp.2d 774 (E.D. Tex. 2009) ("Some amount of money could be calculated for any interference with property rights; that does not necessarily make the amount an adequate legal remedy.").

With knowledge that ▓▓▓▓▓▓, Synthego was busy scaling up its manufacture of Agilent's inventions, giving away free samples, and luring Agilent's customers and KOLs away by promising to provide these patented inventions at a lower cost. As Synthego planned, by attracting and obtaining RUO customers, Synthego could use the stickiness of the market to acquire customers needing large-scale and GMP grade modified gRNA. *E.g.*, Ex. 64 at 69 (▓▓▓▓▓▓

---

[8] In spite of Patent Local Rule 3-4 and discovery requests served in February, ▓▓▓▓▓▓

1   ████████████████    That business model fits squarely within the definition of irreparable

2   harm.[9]  *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996); *See Abbott Lab'ys v.

3   Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (affirming preliminary injunction; "added

4   erosion of markets, customers, and prices, is rarely reversible").

Uncertainty about the marketplace also weighs in favor of injunctive relief.  Synthego cites to Mr. Carter's testimony to imply that the harm to Agilent would be speculative.  *E.g.*, Opp. at 18-21.  But Mr. Carter's testimony supports injunctive relief because there is so much uncertainty.  The market is very secretive and little is known about the actions of possible competitors.  Thus, neither Agilent nor other participants or even third-party market analysts know (and cannot readily ascertain) information about marketshare or competitors' activities.  *E.g.*, Ex. 60 (Carter Dep. Tr.) at 15:25-17:5 (pre-clinical and GMP agreements are confidential, there is limited information from "companies that have made public statements"); 26:3-17 (no reliable market share break-down in pre-clinical areas); 121:19-122:3.[10]  Such uncertainty is well-recognized as a basis to *grant* injunctive relief, as preventing the harm outright avoids concerns associated with merely approximating damages or uncertainty regarding the precision necessary to support a damages analysis.  *See Hybritech Inc v. Abbott Lab'ys*, No. CV-86-7461-AK(PX), 1987 WL 123997, at *20 (C.D. Cal. July 14, 1987) (Kozinski, J.) (granting preliminary injunction, noting unpredictability and difficulty in determining damages in a developing field), *aff'd*, 849 F.2d 1446 (Fed. Cir. 1988); *see also Boyce's Ex'rs v. Grundy*, 28 U.S. (3 Pet.) 210, 214 (1830) ("It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."); *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1259 (D. Kan. 2001).

### C.   The balance of hardships favors injunctive relief.

Entering an injunction as requested is appropriate to preserve the status quo pending a final

---

[9] Agilent's "late" entry to the market and its modest market share in RUO and mid-scale sales (Opp. at 1) are indicative of the irreparable harm Agilent continues to endure. *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1456 (Fed. Cir. 1988).

[10] Synthego's counsel even assumed such uncertainty in his questioning: "Q. Now, with respect to the GMP market sector, *given the confidentiality issues and the unreliable nature of the competitive intelligence*, do you have any idea what the market share is …?" Ex. 60 (Carter Dep. Tr.) at 23:6-13 (emphasis added).

determination on the merits. Given the highly secretive and competitive nature of the market, preservation of the status quo and the existing market structure is particularly warranted, as Agilent has far more to lose if an injunction is not entered—including through lost market share, goodwill, and opportunities to engage directly with manufacturers of pharmaceutical products and other commercial applications—than if the patents were to later be found unenforceable or invalid. This is particularly true given that the requested injunction is limited to therapeutic and commercial applications and Synthego's own uses, and Synthego insists that no customers have reached such a point and provided no evidence or information regarding its own uses.

      Neither Agilent's delay nor arguments in the *Waters* case precludes entry of an injunction to preserve the status quo. The "delay" that Synthego identifies here corresponds to a brief period encompassed by the outbreak of a global pandemic, Agilent's involvement in co-pending litigation, a period in which Synthego had yet to threaten the GMP and GMP-like markets, and a period in which Agilent sought to achieve a business resolution by working directly with Synthego. In no way was Agilent unreasonable in seeking relief here. Even so, the *Waters* case is inapposite. In *Waters*, the plaintiff admitted that it held a 70-80% marketshare and that customers were unlikely to change suppliers; its marketshare was unlikely to be affected. The Plaintiff chose not to bring an infringement action against ProZyme, a direct competitor, from 2015 until late 2018. *Waters*, 410 F. Supp. 3d at 706. Even then, Waters did not sue ProZyme, but waited until it was acquired by Agilent, and then sued Agilent. *Id.* at 707. The *Waters* delay was longer than here and the court found that the requested injunction would not preserve the status quo, but would instead seriously alter it: "Plaintiffs essentially ask the Court to alter the status quo – essentially decreasing the InstantPC share to zero pending trial, even though Plaintiffs' conduct suggests that even up to 20-25% market share did not induce them to sue ProZyme prior to the acquisition." *Id.* at 717. On the other hand, Agilent's requested injunction is limited in nature and seeks to preserve the status quo—indeed, Synthego itself asserts that none of its customers have advanced to a stage that would be affected by Agilent's requested injunction.

      **D.**    **The public interest favors the requested injunctive relief.**

      The public interest factor recognizes encouraging investment in novel applications and

drug development by enforcing patent rights.  *See, e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1384 (Fed. Cir. 2006); *Abbott*, 544 F.3d at 1362.  "The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).  This strong public interest favors injunctive relief here.

        Agilent's requested injunction cannot and will not interrupt or interfere with any ongoing or future clinical trials that may implicate the use of Agilent's patented inventions.  Synthego has not identified any drugs, treatments, or other commercial applications that would be interrupted if the requested injunction is entered—indeed, Synthego asserts that there are no such drugs, therapeutics, or applications at this time.  Thus, the countervailing public interest factors normally considered by courts (e.g., *Sanofi*, 470 F.3d at 1384) are inapplicable here.  To the contrary, entry of a preliminary injunction would provide ample opportunity for Synthego's customers to plan for and avoid potential disruptions to their commercialization efforts.  As Synthego readily admits, most customers considering therapeutic or commercial applications already explore multiple supply sources (Steiner Decl. ¶ 15), and thus an injunction against Synthego is unlikely to meaningfully disrupt their operations.  Moreover, to the extent that an entity strongly preferred the use of Synthego's infringing products and services, the drugmaker could secure a license from Agilent with have-made rights allowing for continued use of Synthego as a supplier.

        Finally, Synthego has not produced any documents that would suggest it is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Synthego's disregard for patent rights throughout the industry is contrary to the strong public interest in enforcing patent rights, favoring entry of the injunction.

## III.   CONCLUSION

        For the foregoing reasons, Agilent respectfully requests that the Court enter an injunction in the form attached hereto as Exhibit A to maintain the status quo while the Court resolves all remaining issues on the expedited schedule already set by the Court.

| | | |
|---|---|---|
| 1 | Dated: June 20, 2022 | Respectfully submitted, |
| 2 | | */s/ Denise De Mory* |
| | | Denise De Mory (SBN 168076) |
| 3 | | Richard Lin (SBN 209233) |
| | | Aaron R. Hand (SBN 245755) |
| 4 | | Brenda Entzminger (SBN 226760) |
| 5 | | BUNSOW DE MORY LLP |
| | | 701 El Camino Real |
| 6 | | Redwood City, Ca 94063 |
| | | (650) 351-7241 Telephone |
| 7 | | (415) 426-4744 Facsimile |
| | | ddemory@bdiplaw.com |
| 8 | | rlin@bdiplaw.com |
| | | ahand@bdiplaw.com |
| 9 | | bentzminger@bdiplaw.com |
| 10 | | |
| | | Attorneys for Defendant/Counter-Claimant |
| 11 | | *Agilent Technologies, Inc.* |